# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1578

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Arkansas. |
| Clayton M. Brown, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  September 12, 2003

Filed:  October 10, 2003

_____

Before SMITH, RICHARD S. ARNOLD, and BEAM, Circuit Judges.

_____

BEAM, Circuit Judge

A jury convicted Clayton Brown of possessing cocaine base (crack) with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(iii).  On appeal, Brown argues the trial court[1] should have granted his motion to suppress and the government's evidence was legally insufficient.  We affirm.

_____

[1]The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

## I.    BACKGROUND

A Texas state court sentenced Brown to ten years' probation after a drug conviction in 2001.  When Brown moved to Arkansas, the State of Arkansas granted his request to transfer his probation sentence to Arkansas.  Arkansas probation officer Heather Allison assumed responsibility for supervising Brown.

During the initial intake interview, Allison explained the probation conditions to Brown, informing him that he was subject to both home visits and probationary searches.  Allison also explained to Brown that he must provide his current address and update Allison if he moved.  Brown agreed and signed a form indicating that he agreed to the probation conditions.[2]

At the intake interview, Brown informed Allison that he lived at 662 West Taylor. Later, Brown provided Allison with a new address, telling Allison that he had moved to live with his girlfriend.  Due to a spelling mistake, Allison was unable to verify Brown's new address.  Because she could not verify the new address, Allison concluded that Brown had provided a false address.

In 2002, based on an informant's tips, an Arkansas drug task force began to investigate Brown's drug involvement.  Task force agents secured a warrant to search Brown's business.  At that time, task force agents did not have probable cause to secure a warrant to search Brown's home.

---

[2]Although the form did not detail the probationary search condition, Brown did not controvert Allison when she testified that she explained the condition to Brown. The trial judge found that the condition was "in place and the evidence indicates . . . that Mr. Brown was made aware of it."  Under different circumstances, the lack of a detailed consent form could impact our inquiry.

Before the task force executed the warrant, a task force agent called Allison and told her about the investigation. After locating Brown's name in the local water records, the agent told Allison that Brown lived at 662 West Taylor. Based on this information and her inability to confirm Brown's new address, Allison decided to conduct a home probationary search. At the task force agent's request, Allison agreed to postpone the probationary search until the task force completed the search of Brown's business.

Either during or shortly after the search of Brown's business, Allison, probation officer Caley, and three task force agents went to 662 West Taylor. Brown did not answer the officers' initial knocks. After the officers knocked at least four times, Brown opened the door and invited the officers inside. Allison testified that she "asked him which room was his and he pointed out which bedroom was his, where he was sleeping." Caley began searching the bedroom and, at Caley's request, the task force agents assisted. In the bedroom closet's laundry hamper, Caley found crack packaged in a way indicative of distribution. In the bedroom dresser, he discovered Brown's wallet, including identification.

The officers arrested Brown at the apartment. A grand jury indicted him for possessing five or more grams of crack with intent to distribute. The trial judge denied Brown's motion to suppress the evidence. The jury convicted Brown and the judge sentenced him to imprisonment, supervised release, a fine, and a special assessment.

Brown timely appealed and he argues two points.[3] First, he argues the trial court should have granted his motion to suppress because the probationary search was simply a "ruse" for the task force to conduct a warrantless search with less than probable cause. Second, he asserts there was legally insufficient evidence because

[3]The government's motion to strike Brown's amended brief is denied.

the agents seized the evidence from his "brother's apartment" and there was no evidence linking Brown to the crack.

## II.    DISCUSSION

### A.    Brown's Motion to Suppress

Relying upon United States v. McFarland, Brown argues that the trial judge should have suppressed the evidence because the probationary search was no more than a "ruse for a police investigation." 116 F.3d 316, 318 (8th Cir. 1997). Stated differently, he argues that Allison was only a "stalking horse" for law enforcement. See United States v. Reyes, 283 F.3d 446, 462 (2d Cir. 2002). The government counterargues that United States v. Knights, 534 U.S. 112, 121 (2001), eliminates the stalking horse theory. We agree with the government.

#### i.    Probationary Searches

In McFarland, we "agree[d] that a parole search is unlawful when it is nothing more than a ruse for a police investigation." 116 F.3d at 318. We also noted that parole officers may work with police officers provided the parole officers are pursuing parole-related objectives. Id. But, the Knights case teaches that traditional Fourth Amendment analysis–not official purpose–determines whether a probationary search is constitutional. Knights, 534 U.S. at 122.

In Knights, the defendant agreed to a probationary condition that authorized probation officers and other law enforcement personnel to search his property. Id. at 114. The written consent form did "not mention anything about purpose." Id. at 116. After a law enforcement officer discovered evidence during a "probationary" search, the trial court granted the defendant's motion to suppress, finding the search was for "investigatory" rather than "probationary" purposes. Id. The Ninth Circuit affirmed.

Knights, 219 F.3d 1138 (9th Cir. 2000). The Supreme Court framed the question as whether the Fourth Amendment limits searches pursuant to such a probation condition to searches with a "probationary purpose." Knights, 534 U.S. at 116.

The Court used the traditional Fourth Amendment balancing test to determine the search's constitutionality. We turn first to that balancing in our analysis of Brown's probationary search.

In every Fourth Amendment case, courts must balance the competing values. On the one hand, we jealously guard privacy and our citizens' right to be free from unreasonable government intrusion. While on the other, we encourage zealous law enforcement to ensure our citizens can safely enjoy their liberties. Accordingly, to determine whether the Fourth Amendment forbids a search, we weigh the degree to which a search intrudes upon an individual's reasonable expectation of privacy against the degree to which the government needs to search to promote its legitimate interests. Id. at 119.

An individual's status as a probationer "informs both sides of that balance." Id.; see United States v. Vincent, 167 F.3d 428, 430 (8th Cir. 1999). A probationary search pursuant to a search condition intrudes less upon protected privacy interests. "[P]robationers do not enjoy the absolute liberty to which every citizen is entitled." Knights, 534 U.S. at 119. (internal quotations omitted). And when a probationer consents to a search condition, his already-reduced reasonable expectation of privacy diminishes significantly. Id. at 120. On the other side of the balance, to protect the innocent, the government legitimately needs more freedom to search probationers because the "'very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" Id. (quoting Griffin v. Wisconsin, 483 U.S. 868, 880 (1987)).

In Knights, the Court therefore concluded that, when a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that condition without a warrant based only upon that officer's reasonable suspicion that the probationer is violating his probation's terms.[4] Id. at 121. The Court rejected the lower court's "investigatory purpose" analysis. It stated "[b]ecause our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose." Id. at 122. And when it rejected any challenge based on the "actual motivations" of the officers, the Court confirmed that the Fourth Amendment does not require a stalking horse inquiry. Id.; see United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002); United States v. Stokes, 292 F.3d 964, 967 (9th Cir. 2002) ("The Supreme Court put a stop to this line of reasoning."); United States v. Reyes, 283 F.3d 446, 462-64 (2d Cir. 2002).

### ii. Application

The district court found that Brown was subject to a search condition that authorized probation officers to search his property upon developing reasonable suspicion. Brown does not challenge this factual finding. Thus, under Knights, we must examine both Brown's probationary condition and the facts upon which the probation officers acted.

We first address one distinction between the probationary condition in this case and the one in Knights. In Knights, the probationary condition authorized searches by both probation officers and law enforcement officers. Id. at 115. There, a police officer searched unaccompanied by probation officers. Id. Because the condition

---

[4]In Knights, because both parties conceded that the officer had a reasonable suspicion, the Court reserved the issue of whether a lesser standard would satisfy the Fourth Amendment. 534 U.S. at 118 & 120 n.6. Because we find Brown's probation officers searched with reasonable suspicion, we also reserve the issue.

authorized searches by law enforcement officers, the Court spent little time analyzing the scope of the condition. Brown's case is slightly different. Here, the district court found that Brown's condition authorized searches by probation officers. But the probation officers brought drug task force agents along to assist with the search. The question is whether, given the scope of Brown's probationary condition, the presence of the additional personnel sways the balancing test. We hold it does not.

Under Knights, we must balance any additional privacy intrusion resulting from the presence of the additional personnel against the legitimate interests advanced by their presence. Probation officer Caley testified, and the district court agreed, that Caley performed the search and the task force agents acted only at his direction. Probation offices are neither designed nor staffed to conduct these types of searches alone. See Reyes, 283 F.3d at 469 (The "'assistance of other law enforcement officers for protection . . . and for taking possession of contraband is appropriate and recommended.'") (quoting David N. Adair, Jr., Probation Officer Searches, 62 Fed. Probation 68 (June 1998)). Probation officers often must bring law enforcement along to ensure the probation officers' safety. See id. We hold the governmental interest in ensuring probation officer safety outweighs any marginal, additional intrusion into Brown's privacy resulting from the task force agents' presence. In short, when a probationary condition authorizes searches by probation officers, the Fourth Amendment does not require probation officers to choose between endangering themselves by searching alone and foregoing the search because they lacked the resources and expertise necessary to search alone safely. Thus, the Knights balance does not change and the government can prevail if Allison had a reasonable suspicion that Brown was violating the terms of his probation.

Allison had a reasonable suspicion that Brown was violating the terms of his probation. A drug task force agent called Allison and told her the task force suspected Brown's involvement in illegal activity. The agent also told her the task force had obtained a warrant to search Brown's business. Prior to receiving this call,

Allison had been unable to confirm Brown's address. So, at a time Allison was unable to verify her probationer's address, a task force agent told her that the force not only suspected Brown's drug involvement, but also had produced enough evidence to secure a warrant to search Brown's business. Allison's suspicion was reasonable. We reject Brown's first argument.

## B.    Legal Sufficiency

Brown also argues we must overturn his conviction because "Brown did not reside at that address at the time of the search and was unaware of the contents in the residence. There was no other link to the evidence other than Brown being in the residence. That is not sufficient to establish possession of drugs or supporting evidence seized." Appellant's Amended Brief at 14.

We review the evidence in the light most favorable to the verdict and we draw all reasonable inferences that support the verdict. United States v. Hernandez, 299 F.3d 984, 988 (8th Cir. 2002). Viewing those facts and inferences, we will reverse only if no reasonable jury could have found Brown guilty beyond a reasonable doubt. Id.

We reject Brown's second argument because the following evidence satisfies this standard: at his intake interview, Brown listed 662 West Taylor as his last known address; when the officers arrived at the apartment, Brown and his girlfriend were there; at the time of the search, Brown's name was still listed on the water bill; Allison testified that, upon arriving at the house, Brown told the officers that he stayed in the bedroom and that his stuff was in the bedroom; and, the officers found Brown's billfold–containing his identification–in the dresser in the same bedroom where the officers found the drugs and evidence.

-8-

## III. CONCLUSION

We affirm.

_____